**IN THE WESTERN DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROBERT HOWARD SWAGGER,    )
                                  )
        Plaintiff,           )
                                  )
      v.                   )    Civil Action No. 10-779
                                  )    Judge Nora Barry Fischer
MICHAEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL    )
SECURITY,                )
                                  )
        Defendant.       )

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

Plaintiff Robert Howard Swagger ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The record has been developed at the administrative level.  For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence.  Therefore, Plaintiff's Motion for Summary Judgment (Docket No. [7]) is GRANTED and the Commissioner's Motion for Summary Judgment (Docket No. [9]) is DENIED.  Accordingly, the matter is REMANDED for further consideration.

### II.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on January 11, 2007, alleging disability due to spinal stenosis, a herniated disc and stomach problems, all beginning on March 19, 2004.  (R. at 9).  Plaintiff's claims were initially denied on June 6, 2007, and a hearing was held before an

ALJ on January 8, 2008. (R. 9-51). Plaintiff, along with a Vocational Expert ("VE"), appeared and testified at the hearing. (R. at 17). On January 22, 2008, the ALJ issued a decision finding that Plaintiff had the ability to perform light work and that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, thereby concluding that Plaintiff was "not disabled" under the Act. (R. at 17-18). On April 8, 2010, the Appeals Council denied Plaintiff's request for review thereby making the ALJ's decision the final decision of the Commissioner. (R. at 1-3). Having exhausted all administrative remedies, Plaintiff filed this action on June 7, 2010. (Docket No. 1). Plaintiff then filed a Motion for Summary Judgment on November 4, 2010. (Docket No. [7]). The Commissioner filed his Motion for Summary Judgment on December 7, 2010. (Docket No. [9]).

### III. STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Demczyk v. Astrue*, Civ. Act. No. 10-239, 2010 WL 4257599 (W.D.Pa. Oct. 21, 2010) (citing *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999)). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Caminiti v. Astrue*, Civ. A. No. 09-64, 2010 WL 3186697 (W.D.Pa. Aug. 11, 2010) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of the record. *Crawford v. Astrue*, Civ. A. No. 08-1160, 2009 WL 1033611 (W.D.Pa. Apr. 15, 2009) (citing *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986)). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or

considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Price v. Barnhart*, 129 F.App'x. 699, 700 (3d Cir. 2005). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Dominski v. Astrue*, Civ A. No. 07-3595, 2008 WL 4589903 (E.D.Pa. Oct. 2008) (citing *Hartranft v. Apfel*, 181 F.3d 358,360 (3d Cir. 1999)). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d. Cir. 2004). To determine whether a finding is supported by substantial evidence, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

Judicial review of the Commissioner's final decisions on disability claims is governed by statute. 42 U.S.C. §§ 405(g)[1], 1383(c)(3).[2] Pursuant to 42 U.S.C. § 405(g), a district court is to review transcripts and records upon which the Commissioner based his determination. 42 U.S.C. § 405(g). Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42

---

[1]

42 U.S.C. § 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action…brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. 42 U.S.C. § 405 (g).

[2]

42 U.S.C. § 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405 (g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title. 42 U.S.C. § 1383(c)(3).

3

U.S.C. §§ 1381-1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period for at least twelve months. 42 U.S.C. § 423(d)(1)(A); *DeCarlo v. Barnhart*, 116 F.App'x. 387, 3890 (3d Cir. 2004). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Thus, the ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 Subpt. P., Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considered to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Id.* at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision against the record.

## IV. STATEMENT OF FACTS

### A. Plaintiff's Personal Background

Plaintiff was born on December 30, 1959. (R. at 23). Plaintiff is 50 years old and has 4 children. (R. at 23, 169). On March 19, 2004, the date on which Plaintiff claims he was injured, he was 44 years old. (R. at 23). Plaintiff has stated that he smokes two packs of cigarettes a day and has done so for 20 years. (R. at 169). Plaintiff has denied the use of recreational drugs. *Id*. Plaintiff has earned a GED and was employed as a construction laborer and/or manual laborer until March 19, 2004. (R. at 23).

### B. Plaintiff's Medical Background

#### 1. *Plaintiff's Treatment with Dr. Matt El-Kadi: May 20, 2004*

On May 20, 2004, Plaintiff visited Matt El-Kadi, M.D., PhD., for an evaluation regarding his low back pain. (R. at 169). Plaintiff claimed that he developed the onset of low back pain when he was asked to move a stone at his workplace on March 19, 2004. *Id*. Plaintiff further claimed that the low back pain radiated to the posterior side of his right leg. *Id*. Plaintiff had no prior history of back problems and no previous radiographic studies before the incident. *Id*. Dr. El-Kadi indicated that Plaintiff brought with him a lumbar MRI scan dated March 23, 2004 which revealed that Plaintiff had a L5-S1 central to the right disk herniation[3] with bilateral L5-S1 foraminal stenosis,[4] and a disk/osteophyte[5] at the L4-5 and the L3-4 level, with bilateral foraminal narrowing at the L4-5 and L3-4 levels. (R. at 170). The MRI on March 23, 2004 showed demonstrative advanced disc space narrowing with circumferential disc bulging in each of the levels of L3-4, L4-5 and L5-S1. (R. at 163). Specifically, the MRI revealed a moderate narrowing at the L3-L4 level, severe narrowing at L4-5 with displacement of the L4 nerve roots, narrowing to a severe degree on the right at L5-S1 and to a moderate-severe degree on the left. *Id*. Dr. El-Kadi prescribed conservative treatment which included Motrin and Flexeril, both muscle relaxants, as well as physical therapy and EMG/nerve conduction studies. (R. at 170).

---

[3]

A herniation is a protrusion of an anatomic structure from its normal anatomic position. A disc herniation is the extension of disc material into the spinal canal. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[4]

A foraminal stenosis is a stricture of any canal or orifice. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[5]

An osteophyte is a bony outgrowth or protuberance. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Subsequently, Plaintiff was subscribed Oxycontin and Oxycodone tablets for his back problems. (R. at 185).

### 2. *Electrodiagnostic Testing: May 21, 2004*

On May 21, 2004, Plaintiff underwent electrodiagnostic testing[6] after he complained of lower back pain that radiated down his right leg through the calf and into the foot and toes. (R. at 165). Plaintiff stated that he believed this injury stemmed from the lifting of a rock on March 19, 2004. *Id*. The results showed all nerve and muscles testing within normal limits. (R. at 166-167).

### 3. *Jameson Memorial Hospital: June 3, 2004*

On June 3, 2004, Plaintiff was admitted to the emergency room at Jameson Memorial Hospital after he was allegedly assaulted by 6 men. (R. at 176). Plaintiff complained of moderate pain in the left side of his head, left wrist and left ribs. (R. at 176-177). The record indicates that he had a herniated disc. (R. at 177). Tests on Plaintiff's ribs and wrist revealed no fracture and no significant radiographic abnormality. (R. at 182-183). Tests on Plaintiff's facial bones revealed a fracture of the nasal bone with mild deformity. (R. at 184).

### 4. *Workers' Compensation History Form: June 17, 2004*

On June 17, 2004, Plaintiff completed a workers' compensation history form in which he indicated that he injured his lower back while lifting a foundation rock. (R. at 220). In addition, Plaintiff stated that he lifted 30 to 350 pounds per day and that he performed this level of lifting all day long while moving rocks. *Id*.

---

[6] Electrodiagnostic testing is the use of electronic devices for diagnostic purposes in the EMG laboratory, i.e., nerve conduction studies and needle electrode examination. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

*5. Heritage Valley Medical Center:  August 10, 2004 and August 11, 2004*

On August 10, 2004, Plaintiff went to the Emergency Department at the Heritage Valley Medical Center in Beaver, Pennsylvania.  (R. at 185).  Plaintiff claimed that he was nauseated, suffered abdominal pain and that he was unable to keep down his pain medications.  *Id*.  Plaintiff was diagnosed with nausea and vomiting and acute narcotic withdrawal.  (R. at 186).  On August 11, 2004, Plaintiff again visited the Emergency Department at the Heritage Valley Medical Center.  (R. at 187).  His chief complaints were stomach pains and vomiting.  *Id*.  He was diagnosed with acute nausea and vomiting and probable narcotic withdrawal.  *Id*.  Plaintiff's abdominal problems continued, and he later had a HIDA scan[7] performed on July 14, 2006. (R. at 324).  This scan revealed that Plaintiff had severe biliary dyskinesia.[8]  *Id*.

*6. Letter from Dr. Van Edward Scott:  February 2, 2005*

On February 2, 2005, Plaintiff received a letter from Dr. Van Edward Scott notifying him that he had violated his pain management agreement and that he was discharged from the practice as of February 4, 2005.  (R. at 191).  At the administrative hearing on January 8, 2008, Plaintiff stated that he had seen Dr. Van Edward Scott for about a year, but that he switched to Dr. James Dambrogio because Dr. Van Edward Scott would never check his back before prescribing pain medication.  (R. at 33).

---

[7]

"A HIDA scan is an imaging procedure that helps track the production and flow of bile from your liver to your small intestine."  MayoClinic.com, HIDA scan, available at: http://www.mayoclinic.com/health/hida-scan/MY00320 (last visited November 22, 2010).

[8]

Dyskinesia is difficulty in performing voluntary movements.  STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

### 7. *Jameson Memorial Hospital: February 3, 2005*

On February 3, 2005, Plaintiff was admitted to the emergency room in Jameson Memorial Hospital for nausea, vomiting and abdominal pain. (R. at 243). Testing of the abdomen revealed a non-obstructive bowel gas pattern. *Id*. Subsequent tests for appendicitis were negative. (R. at 244).

### 8. *Plaintiff's Treatment with Dr. Jonathan McClure: July 11, 2006*

On July 11, 2006, Plaintiff was evaluated by Dr. Jonathan K. McClure at Valley Gastroenterology Associates in Beaver Falls, Pennsylvania. (R. at 339). There, Plaintiff reported that he had been experiencing intermittent spells of abdominal pain, nausea and vomiting, but that in between those spells he felt perfectly fine. *Id*. Plaintiff told Dr. McClure that the spells usually lasted several days. *Id*. Dr. McClure noted that Plaintiff did not drink anything for a week and all of the sudden he started to experience epigastric pain associated with nausea and vomiting. *Id*. Dr. McClure indicated that Plaintiff has a history of drug use and that Plaintiff was taking methadone at that point in time. *Id*. Subsequent drug screening returned positive results for cannabinoids. (R. at 340). Indeed, the medical record indicates that Plaintiff has had a history of narcotic abuse with Oxycontin and marijuana. (R. at 258, 263, 264).

### 9. *Jameson Memorial Hospital: July 25, 2006*

On July 25, 2006, Plaintiff was admitted to Jameson Memorial Hospital for abdominal pain. (R. at 258). Plaintiff complained of attacks of nausea and vomiting occurring every 2 to 3 months. *Id*. Plaintiff had gallbladder surgery and was discharged on the same day. (R. at 255, 271). Plaintiff's abdominal problems improved only for a short period of time after his surgery. (R. at 335). He was then advised to undergo a colonoscopy and endoscopy. *Id*.

10. *Plaintiff's Treatment with Dr. Anthony Elisco and Dr. Roberto Bendoni: November 22, 2006 through July 17, 2007*

On November 22, 2006, Plaintiff discussed his condition with Dr. Anthony J. Elisco. (R. at 401). Plaintiff advised Dr. Elisco that he was experiencing persistent vomiting. *Id*. Plaintiff told Dr. Elisco that he had seen several health care providers regarding this problem and that he has been told that the emesis is likely due to his history of narcotics abuse and withdrawal symptoms. *Id*. Dr. Elisco recommended that Plaintiff repeat a HIDA[9] scan as he might have a small stone in his gallbladder. *Id*. Additionally, Dr. Elisco recommended an esophagogastroduodenoscopy.[10] *Id*.

Plaintiff scheduled another visit with Dr. Elisco on January 29, 2007 where he reported that he was having chronic neck and back problems. (R. at 400).[11] Plaintiff told Dr. Elisco that he reinjured his back when he fell the week before. *Id*. Dr. Elisco determined that Plaintiff had spinal stenosis and degenerative joint disease. *Id*.

On July 17, 2007, Plaintiff saw Dr. Roberto Bendoni at Jameson Memorial Hospital complaining of abdominal pain. (R. at 411). Dr. Bendoni stated that Plaintiff had an esophagogastroduodenoscopy[12] performed in December 2006 that returned normal results. *Id*.

---

[9]

*See* note 7.

[10]

An esophagogastroduodenoscopy is endoscopic examination of the esophagus, stomach, and duodenum usually performed using a fiberoptic instrument. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[11]

At that time Plaintiff also saw Dr. D'Ambrosia, a pain management specialist, who had prescribed him Oxycontin for pain. (R. at 400).

[12]

*See* note 10.

Plaintiff denied any overt gastrointestinal bleeding. *Id.* Dr. Bendoni stated that Plaintiff clinically appeared to have pancreatitis of unknown etiology. *Id.*

11. *Plaintiff's Treatment with Dr. Morry Moskovitz and Dr. Kenneth Hopper: December 5, 2006 and December 6, 2006*

On December 5, 2006, Plaintiff was treated by Dr. Morry Moskovitz at the Four Seasons Endoscopy Center, in Beaver Falls, Pennsylvania. (R. at 306). Dr. Moskovitz performed an upper GI endoscopy and found that Plaintiff's stomach and esophagus were normal. (R. at 308). Dr. Moskovitz also performed a colonoscopy and found a semi-sessile polyp[13] in the Plaintiff's colon. (R. at 306). The sessile polyp was removed with a hot snare. *Id.* Plaintiff was sent home and Dr. Moskovitz recommended that Plaintiff have a small bowel follow-through. (R. at 307). Plaintiff's small bowel follow-through was performed by Dr. Kenneth Hopper at Jameson Memorial Hospital on December 6, 2006. (R. at 312-13). Dr. Hopper diagnosed Plaintiff with normal small bowel follow-through and probable left renal calculus. (R. at 313).

12. *Plaintiff's Treatment with Dr. Michael Y. de Jesus: January 5, 2007 through February 1, 2007*

On January 5, 2007, Plaintiff sought treatment with Dr. Michael Y. de Jesus at Valley Gastroenterology Associates, in Beaver Falls, Pennsylvania. (R. at 336). Dr. de Jesus reported that he could not find an explanation for Plaintiff's abdominal condition and recommended that Plaintiff undergo a solid phase gastric emptying study. *Id.* On January 17, 2007, the solid phase gastric emptying study was performed and it revealed that Plaintiff had a borderline delay in gastric emptying. (R. at 334). On February 1, 2007, Dr. de Jesus indicated that although

---

[13]

A polyp is any mass tissue that bulges or projects outward or upward from the normal surface level. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Plaintiff continued to have nausea and vomiting, his symptoms had improved significantly and he should follow up with his primary care physician.  *Id*.

### 13. *Plaintiff's Lumbar Spine MRI:  February 5, 2007*

Plaintiff underwent a Lumbar Spine MRI on February 5, 2007 at Lawrence County MRI & Diagnostic Imaging Center in New Castle, Pennsylvania.  (R. at 397).  The MRI report by Dr. Richard Pica revealed: (1) multilevel spinal stenosis most severe at L3-4 and L4-5; (2) multilevel disk space narrowing and degenerative changes most severe at L4-5 and L5-S1; (3) bilateral neural foraminal narrowing which is moderate to severe bilaterally at L4-5 and L5-S1; and (4) endplate marrow edema involving the superior endplate of L3 and endplates at L5-S1 most likely related to degenerative microtrauma.  (R. at 398).

### 14. *Plaintiff's Treatment with Dr. James Dambrogio:  March 6, 2007 through December 17, 2007*

From March 6, 2006 to December 17, 2007, Plaintiff received care from Dr. James P. Dambrogio for his low back pain and abdominal problems.  (R. at 287-304).  During this period, Plaintiff complained that he suffered from pain in his low back that radiated into the posterior aspect of both his thighs and legs as well as that severe abdominal cramping, nausea and vomiting had aggravated this condition.  (R. at 300).  Dr. Dambrogio noted that Plaintiff was active with his children and performed some yard work.  (R. at 301).

Dr. Dambrogio's treatment notes from October 27, 2006 state that Plaintiff was able to function on a daily basis but that he was unable to find any gainful employment because of the pain and burning in his lower back.  (R. at 289).  The notes further state that Plaintiff's normal daily activities were managed well with his analgesic medication and that he took frequent breaks during the day to lie down when the spasms and pain became worse.  *Id*.  Dr. Dambrogio restricted Plaintiff from lifting anything over 10 pounds and restricted Plaintiff from participating

in any repetitive bending, lifting and stooping. *Id*. Dr. Dambrogio's impression was that Plaintiff suffered from degenerative disc disease of the lumbar spine and a lumbosacral strain and sprain. *Id*.

Dr. Dambrogio's treatment notes from November 13, 2006 indicate that Plaintiff was able to function normally on a daily basis and could participate in normal activities; however, he still had difficulty bending, stooping and lifting. (R. at 356). Dr. Dambrogio's diagnosis was that Plaintiff suffered from degenerative disc disease of the lumbar spine, lumbosacral strain and sprain, and lumbar radiculopathy. (R. at 356). Dr. Dambrogio's treatment plan for Plaintiff included continuing his current analgesic regimen to maintain good function and to seek employment as soon as his condition stabilized. *Id*.

Plaintiff's last visit with Dr. Dambrogio was on December 17, 2007. (R. at 363-66). There, Plaintiff stated that his low back pain was worse during the prior couple of days because of the cold weather. (R. at 363). The notes describe Plaintiff's pain as stabbing and throbbing which worsened by lifting heavy weights, sitting, standing, twisting, walking, rotational movements or change in weather. *Id*. Moreover, Dr. Dambrogio's notes state that Plaintiff's pain woke him up 4 to 5 times per night. *Id*. Dr. Dambrogio wrote that Plaintiff smoked 1 pack of cigarettes per day and that Plaintiff quit drinking 2 years prior to the examination. *Id*. During the December 17, 2007 visit, Plaintiff indicated that even after taking his medication his pain level was 5 on a scale of 1-10 with 10 being the most painful. (R. at 364). Plaintiff stated that he experienced chronic pain, back problems and leg problems. *Id*. However, Plaintiff denied any arthritis, acute pain, altered mobility, reduced mobility and any neck, shoulder, arm, wrist, hip, knee or ankle problems. *Id*. Moreover, Plaintiff denied any anxiety, depression, mood swings

and any alcohol or drug addiction. *Id*. Dr. Dambrogio recommended that Plaintiff continue with his medication and pain management goals. (R. at 366).

### 15. *Plaintiff's Psychological Background*

On September 12, 2007, Plaintiff consulted with therapist Vivien M. Goldenson, ACSW/LSW at People in Need, in New Castle, Pennsylvania. (R. at 405-07). Ms. Goldenson provided a provisional diagnosis that Plaintiff suffered from adjustment disorder with mixed anxiety and depression. (R. at 406). She also diagnosed Plaintiff as presenting a moderate level of major depression, recurrent. *Id*. In her report, Ms. Goldenson noted that Plaintiff had not been able to work for 3 years because of his health problems and that his previous applications for disability had been rejected. *Id*.

In the follow-up session on September 28, 2007, Ms. Goldenson diagnosed Plaintiff with adjustment disorder with anxiety as well as chronic pain with both a psychological and axis III diagnosis. (R. at 407). Ms. Goldenson noted that Plaintiff had been having financial problems because he cannot work. *Id*. To that end, Plaintiff told Ms. Goldenson that he hoped his disability hearing would be soon so that he would finally get his money.[14] *Id*.

### 16. *Vocational Expert's Findings*

Dr. Charles M. Cohen testified as a VE before the ALJ at the hearing held on January 8, 2008. (R. at 17). Dr. Cohen earned his Bachelor of Arts in Psychology from Duquesne University in 1965. (R. at 87). He earned his Masters in Education from the University of Pittsburgh in 1966 and his Ph.D. in Counselor Education from the University of Pittsburgh in 1970. *Id*. In addition, Dr. Cohen has earned 24 post-doctoral credits related to psychological

---

[14]

Plaintiff had been unsuccessful in his attempts to borrow money from his friends and family. (R. at 407). Furthermore, Plaintiff noted that his wife has been employed as a bus driver, but that she did not make much money in her job. *Id*.

evaluation and psychotherapy. *Id.* Dr. Cohen is a licensed psychologist in Pennsylvania and is a certified rehabilitation and guidance counselor. *Id.* Moreover, Dr. Cohen is a board certified vocational expert. *Id.* Plaintiff did not object to Dr. Cohen testifying as a VE.

The ALJ asked the VE whether work existed for a hypothetical individual who was capable of performing light work which would be restricted to no more than incidental postural adaptions of stooping, kneeling, crouching, crawling, balancing and climbing; with no exposure to hazards such as unprotected heights and dangerous machinery or temperature extremes; with a job that would allow the claimant to sit/stand at his discretion; and would be restricted to simple, routine, repetitive tasks involving no piece-work production rate pace. (R. at 48-49). In response, the VE testified that given all of these factors the individual would be able to perform the requirements of occupations such as a packaging worker (about 700,000 jobs in the national economy), an assembler (about 1.9 million jobs in the national economy), and an inspector (about 300,000 jobs in the national economy. (R. at 49). In response to an additional hypothetical, the VE stated that there would be no jobs in the national economy if an individual required an accommodation for unscheduled rest breaks at an average of fifteen minutes per hour throughout the workday. (R. at 49-50).

On cross-examination, Dr. Cohen stated that work at the light level requires the worker to exert up to 20 pounds of force occasionally, with 10 pounds frequently. (R. at 50). Dr. Cohen further stated that if the worker is unable to lift 10 pounds on a frequent basis, it would impact his ability to perform any of the examples of available work that Dr. Cohen identified and that the limitation would prevent the worker from participating in jobs at the light level. *Id.*

*17. Administrative Hearing:  January 8, 2008*

A hearing regarding Plaintiff's application for DIB and SSI was held on January 8, 2008 in Seven Fields, Pennsylvania before Administrative Law Judge Lamar W. Davis.  (R. at 19). Plaintiff's testimony at the hearing revealed the following information:  Plaintiff lost 27 pounds because of his medical problems.  (R. at 28).  Plaintiff is able to help his children get ready for school, but afterwards he needs to lay down for about an hour.  *Id.*  Otherwise, Plaintiff said he can do laundry, but that he suffers the following week if he overextends himself around the house.  *Id.*  Plaintiff attempted to do work in the yard, but he ended up having to stay in bed for about a week-and-a-half to recover.  (R. at 29).  Plaintiff begins to experience a throbbing feeling from just walking 100 yards to the mailbox.  (R. at 36).  The farthest he can walk is 40 yards, but sometimes his right leg goes numb and he ends of tripping over his own feet.  (R. at 41-42).  For about 3 years he has been using a cane that Dr. Dambrogio gave him to help him walk.  (R. at 44).  Moreover, his temper had become really short with his children because of his pain.  (R. at 37).  He further stated that he was taking Oxycontin and Roxicodone,[15] Soma[16] and Lexapro,[17] but that these mediations make him very tired.  (R. at 38).

---

[15]

Oxycontin and Roxicodone are both forms of Oxycodone which is used to relieve moderate to severe pain.  National Center for Biotechnology Information, "Oxycodon," *available at*:  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589 (last visited December 3, 2010). Oxycodone is in a class of medications called opiate (narcotic) analgesics.  It works by changing the way the brain and nervous system respond to pain.  *Id.*

[16]

Soma (or Carisoprodol), a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries.  National Center for Biotechnology Information, "Carisoprodol," *available at*: http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717 (last visited December 3, 2010).

[17]

The ALJ issued his decision on January 22, 2008, concluding that Plaintiff's medically determinable impairments did not meet the requirements for benefits and that Plaintiff retained the residual functional capacity to perform jobs that exist in significant numbers in the national economy. (R. at 17). In reaching that determination, the ALJ found that Plaintiff has not engaged in substantial gainful activity since March 19, 2004. (R. at 11). In addition, the ALJ opined that Plaintiff has severe impairments of degenerative disc disease of the cervical and lumbar regions; adjustment disorder with mixed features; major depression; and various gastrointestinal complaints with status post gallbladder surgery. *Id.*

However, the ALJ ruled that Plaintiff's impairments or combination of impairments do not meet or medically equal one of the listed impairments. (R. at 12). In making this determination, the ALJ cited various factors. First, the ALJ found that the medical record contains very limited documentation of any significant mental impairments. *Id.* Specifically, the ALJ noted that reports from various caregivers in the record do not indicate signs and symptoms of a significant mental impairment. *Id.* Secondly, the ALJ found no indication in the record that Plaintiff has required hospitalization or emergency room treatment for acute exacerbation of depression, anxiety or any other mental impairment. *Id.* Third, the ALJ determined that Plaintiff did not exhibit severe impairment in thought processes, memory, concentration or focus which would limit his ability to complete tasks, especially those of simple, routine nature. (R. at 13). Therefore, the ALJ held that Plaintiff is only moderately limited as to listed mental impairments. *Id.*

---

Lexapro (or escitalopram) is used to treat depression and generalized anxiety disorder. National Center for Biotechnology Information, "Escitalopram," available at: http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214 (last visited December 3, 2010).

Regarding Plaintiff's residual functional capacity, the ALJ determined that Plaintiff has the capacity to perform light work, which would involve only incidental postural maneuvers such as stooping, kneeling, crouching, crawling, balancing and climbing. (R. at 11-13). The ALJ noted that there is no doubt that Plaintiff has a lumbar impairment capable of producing pain, as the results of diagnostic studies, including two MRI scans, have been consistent with rather advanced degenerative disc disease of the lumbar spine and a disc herniation. (R. at 15). In addition, although Plaintiff alleged that he uses a prescribed cane for ambulation, the ALJ found no reference in the record for such an assistive device. *Id*. The ALJ then determined that the examinations by Dr. Dambrogio, a treating pain management specialist, and Dr. El-Kadi, a neurologist, do not establish significant neurological compromise. *Id*. The ALJ did not find Plaintiff's assertions regarding gastrointestinal symptoms credible, as a number of studies have resulted in either negative or show quite minimal findings. (R. at 15-16). Therefore, the ALJ found that Plaintiff's residual function capacity for light work with the various postural limitations and allowance for a sit/stand option would tend to accommodate Plaintiff's restrictions and his pain complaints. *Id*.

The ALJ next found that Plaintiff cannot return to the demands of his past relevant work as a construction laborer, which was a heavy, semiskilled position. (R. at 16). Further, the ALJ found that Plaintiff is limited from exposure to hazardous situations such as unprotected heights, dangerous machinery, and temperature extremes, and, based on the testimony of the VE and considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff is capable of making a successful adjustment to other work that exists in the national economy, such as a packaging worker, an assembler, or an inspector. (R. at 16-17). Accordingly, the ALJ

found that Plaintiff is not disabled under the Act and, thus, denied his disability benefits. (R. at 17).

## V. DISCUSSION

In his Motion for Summary Judgment, Plaintiff asserts four alleged errors by the ALJ. (Docket Nos. 7, 8). Plaintiff first argues that he clearly met the requirements of Listing 1.04 for Disorders of the Spine, despite the ALJ's finding otherwise. (Docket No. 8 at 4-6). Second, Plaintiff contends that the ALJ erred by disregarding or discounting the medical records of Plaintiff's treating physician, Dr. James P. Dambrogio. *Id*. Third, Plaintiff asserts that the ALJ failed to give proper weight to Plaintiff's subjective complaints of pain. *Id*. at 6-7. Finally, Plaintiff argues that the ALJ's determinations contradict the testimony of the vocational expert, Dr. Charles M. Cohen, and did not properly explain the contradiction. *Id*. at 7-8. Taken together, Plaintiff alleges that the ALJ's opinion is not supported by substantial evidence. *Id*. at 8. In his Motion for Summary Judgment, the Commissioner ("Defendant") maintains that the ALJ's findings and determination are supported by substantial evidence. (Docket Nos. 8, 9). The Court will address each of these arguments, in turn.

### A. Listing 1.04

First, Plaintiff argues that he has been diagnosed with both degenerative disc disease and lumbar spinal stenosis and, consequently, he meets or exceeds Listing 1.04 Disorders of the Spine. (Docket No. 8 at 5-6). Section 1.04C requires a documented diagnosis of lumbar spinal stenosis that results in an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04C.

The Code of Federal Regulations defines 1.04 Disorders of the Spine as follows:

> 1.04 *Disorders of the spine* (e.g. herniated nucleus pulpsus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc

disease, facet arthritis, and vertebral facture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord, with:

\* \* \* \* \*

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b).

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04C. Listing 1.00(B)(2)(b) defines ineffective ambulation as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive devise that limits the functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00(B)(2)(b).

Defendant asserts that the ALJ reasonably found that Plaintiff did not meet or exceed Listing 1.04 <u>Disorders of the Spine</u> because his ability to ambulate effectively was not seriously compromised and he did not suffer significant neurological compromise involving any of his extremities, as required by the Listing. (Docket No. 10 at 9). Defendant argues that Plaintiff's EMG and nerve conduction study (R. at 165-67) showed no evidence of radiculopathy, focal entrapment, peripheral polyneuropathy, or myopathy. (Docket No. 10 at 10). Furthermore, Defendant argues that there was no evidence that Plaintiff was unable to carry out routine ambulatory activities such as shopping, banking, or climbing a few steps, which are all examples of the required loss of function outlined in section 1.00(B). *Id.* Specifically, Defendant contends that Plaintiff's ability to walk effectively is evident from Dr. Dambrogio's repeated instruction for Plaintiff to walk for exercise. *Id.* at 9. In addition, Defendant points to Dr. Dambrogio's notes that indicate that Plaintiff was exercising two or three times a week, walking twenty to

thirty minutes every day and "was very active with his children, helping them do some yard work." *Id*. at 9-10.

In determining whether Plaintiff meets the requirements of a listed impairment, the ALJ must properly analyze the entire record so that the reviewing court can determine whether the decision was supported by substantial evidence. *Burnett v. Comm'r of Soc. Sec. Admin*., 220 F.3d 112, 119-20 (3d Cir. 2000) (holding that an ALJ's summary conclusion that appellant's impairments did not meet or equal any Listed Impairment, without discussing the evidence or explaining his reasoning, renders the ALJ's Step-Three determination beyond meaningful review)). The decision of the ALJ should be accompanied by a "clear and satisfactory explanation of the basis on which it rests." *Cruz v. Astrue*, 2009 WL 255629, at *4, Civ. Act. No. 08-204 (E.D. Pa., Jan. 29, 2009) (quoting *Cotter*, 642 F.2d at 704).

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (emphasis in original) (quoting *Sullivan v. Zebley*, 110 S.Ct. 885, 891 (1990)). Although the medical documentation shows that Plaintiff was diagnosed with lumbar spinal stenosis (R. at 356, 374, 398), the ALJ concluded that the impairment did not result in an inability to ambulate effectively, as defined by the regulations. (R. at 12).

In addressing Plaintiff's argument that his musculoskeletal condition fulfills the requirements of Listing 1.04 <u>Disorders of the Spine</u>, the ALJ determined that "[a]lthough Plaintiff obviously has rather advanced degenerative disc disease of the lumbar spine, his ability to ambulate effectively has not been seriously compromised, nor does he suffer significant neurological compromise involving any of his extremities." *Id*. As mentioned above, the ALJ

determined from Dr. Dambrogio's notes that Plaintiff was not experiencing decreased mobility and that he was actually more active than he had alleged. (R. at 15). Moreover, although Plaintiff has alleged that he uses a prescribed cane for ambulation, the ALJ could not find any reference in the record for such an assistive device. *Id.* Therefore, the ALJ concluded that his decision is consistent with the numerous records provided by Dr. Dambrogio. (R. at 12).

It is clear from the ALJ's decision that in making his determination he relied on Dr. Dambrogio's treatment notes and the MRI scans. (R. at 12). The ALJ agrees with Plaintiff that he suffers from advanced degenerative disc disease of the lumbar spine. *Id.* However, that conclusion only satisfies the first criteria to qualify as a Listing in 1.04, <u>Disorders of the Spine</u>. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04. In order to meet the Listing, Plaintiff must qualify under one of the additional criteria as listed above. *Id.* The ALJ made a determination that Plaintiff did not. (R. at 12). Merely having lumbar spinal stenosis is not sufficient. "The lumbar spinal stenosis must result in pseudo claudication,[18] established by finding an appropriate medical imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04C. After reviewing the medical evidence and testimony, the ALJ determined that Plaintiff's condition did not result in inability to ambulate effectively. (R. at 12). Moreover, the ALJ provided a clear and satisfactory explanation of the basis for his conclusion in his decision. See *Cruz,* at *4 (quoting *Cotter*, 642 F.2d at 704).

As discussed above, the ALJ reasonably determined from Dr. Dambrogio's treatment notes that Plaintiff's ability to ambulate effectively has not been seriously compromised.

---

[18]

Claudication means limping or walking with difficulty. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Accordingly, the ALJ's decision that Plaintiff did not satisfy all of the criteria as set forth in Listing 1.04 <u>Disorders of the Spine</u> is supported by substantial evidence.

### B. Evaluation of Dr. Dambrogio's Opinion

Second, Plaintiff argues that the ALJ failed to give controlling weight to the opinion of his treating physician, Dr. James P. Dambrogio. (Docket No. 8 at 5-6). Moreover, Plaintiff contends that Dr. Dambrogio's diagnosis is supported by the report of Dr. Richard Pica,[19] which states that Plaintiff suffers from multilevel spinal stenosis and multilevel disk space narrowing. (Docket No. 8 at 5). Next, Plaintiff asserts that the ALJ did not provide adequate reasons for rejecting this "uncontradicted medical evidence that clearly shows that Plaintiff has been diagnosed with both degenerative disc disease and lumbar spinal stenosis." *Id*.

Defendant avers that the ALJ did not disregard the treating physician's diagnoses. (Docket No. 10 at 10). Specifically, Defendant argues that while the ALJ did acknowledge Dr. Dambrogio's diagnoses, the ALJ went on to evaluate whether Plaintiff met the other criteria of the Listings and correctly found that he did not. *Id*.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). More weight should be given to the opinions of a claimant's treating physician because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal

---

[19] Plaintiff underwent a Lumbar Spine MRI on February 5, 2007 at Lawrence County MRI & Diagnostic Imaging Center in New Castle, Pennsylvania. (R. at 397). The MRI report by Richard Pica, M.D. revealed: (1) multilevel spinal stenosis most severe at L3-4 and L4-5; (2) multilevel disk space narrowing and degenerative changes most severe at L4-5 and L5-S1; (3) bilateral neural foraminal narrowing which is moderate to severe bilaterally at L4-5 and L5-S1; and (4) endplate marrow edema involving the superior endplate of L3 and endplates at L5-S1 most likely related to degenerative microtrauma. (R. at 398).

picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)).

The Court of Appeals has consistently held that the "treating physician's opinion may be rejected only on the basis of contradictory medical evidence, although the opinion may be accorded more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). When rejecting a treating physician's findings or according such findings less weight, an ALJ must be as "comprehensive and analytical as feasible" and provide the factual foundation for the decision and specific findings that were rejected. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Such an explanation is not required to match the rigor of "medical or scientific analysis," since the ALJ is a "non-scientist." *Id.*

Dr. Dambrogio's diagnosis was that Plaintiff suffered from degenerative disc disease of the lumbar spine, lumbosacral strain and sprain, and lumbar radiculopathy. (R. at 356). The ALJ states that Plaintiff's ability to ambulate effectively has not been seriously compromised and that his finding is "consistent with the numerous office records provided by Dr. Dambrogio, a treating pain management specialist." (R. at 12). With respect to Dr. Dambrogio's diagnoses, the ALJ stated as follows:

> In evaluating the claimant's musculoskeletal complaints, I must afford significant weight to the findings and assessments provided by Dr. Dambrogio, who is a treating pain management specialist who has seen the claimant on multiple occasions over the last several years. In May 2006, the physician commented that the claimant's medications were "working fine" (Exhibit 12F). One month later, the claimant was putting in a flower garden. In September 2006, Dr. Dambrogio noted that the claimant had been

active working in his yard and getting ready for winter. One month later, the physician assessed that the claimant was managing his activities of daily living well with his medications although he could not lift more than 10 pounds or do any repetitive bending, lifting, or stooping. As of November 2006, Dr. Dambrogio mentioned that the claimant's functional status remained good and that he can function normally with normal daily activities, including mobility (Exhibit 21F). A few months before the claimant's hearing, the claimant was doing more activities with his son, including scouting and helping him with hunting. As of December 2007, Dr. Dambrogio also reported that the claimant denied any decreased mobility (Exhibits 12F and 21F). Although at his hearing the claimant tended to minimize or deny these various activities, I see no reason for his treating physician to fabricate such statements. The record shows that despite his assertions of minimal activities and the fact that he has not worked for over three years, there are no signs of clinical atrophy, which tends to suggest that the claimant has been more active than he has alleged.

(R. at 15). Indeed, the ALJ notes that he must afford significant weight to the findings and assessments provided by Dr. Dambrogio because he is a treating physician who has seen Plaintiff on multiple occasions over the last several years. (R. at 15). None the less, the ALJ determined that Plaintiff has the residual functional capacity to perform "light work" with various postural limitations and allowance for a sit/stand option that would tend to accommodate the claimant's functional restrictions and his pain complaints. (R. at 14-16).

"'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's residual functional capacity represents the most, not the least, that a person can do despite his or her limitations. *See Cooper v. Barnhart*, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a person's residual functional capacity, an ALJ must consider all evidence of record. 20 C.F.R. § 416.920. Although an ALJ can weigh the credibility of the

evidence when making a residual functional capacity determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Fargnoli*, 247 F.3d at 43. As the court stated in *Burnett*, "[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

Plaintiff cannot be denied benefits simply because the ALJ made a different medical judgment than the treating physician. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) ("[t]he Secretary cannot reject those medical determinations simply by having the administrative law judge make a different medical judgment."); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("an ALJ is not free to set his own expertise against that of a physician who presents competent evidence."). Rather, the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence. *See Plummer*, 186 F.3d at 429; *Frankenfield*, 861 F.2d at 408 (citing *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979)).

Although the ALJ states that his findings are consistent with Dr. Dambrogio's examination of Plaintiff, the ALJ did not resolve the issue regarding Dr. Dambrogio's treatment note of October 27, 2006 that restricted Plaintiff from lifting anything over 10 pounds as well as any repetitive bending, lifting, or stooping. (R. at 289). Despite his obligation to do so, the ALJ provided no indication why he rejected this specific limitation in determining that Plaintiff has the residual functional capacity to perform "light work." *See Fargnoli*, 247 F.3d at 43; (R. at 13).

The Code of Federal Regulations provides the following definition of "light work":

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

> when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). Indeed, Plaintiff states in his application for benefits filed on January 11, 2007 that he "can only lift 20 lb. max." (R. at 139). However, to qualify for "light work" the critical test is not whether Plaintiff can lift a maximum of 20 pounds once in a while. 20 C.F.R. § 404.1567(b). The test is whether Plaintiff can frequently lift or carry objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). As stated above, Dr. Dambrogio restricted Plaintiff from lifting anything over 10 pounds as well as any repetitive bending, lifting or stooping. (R. at 289). Despite this restriction, the ALJ determined that Plaintiff can perform "light work." (R. at 15).

Even if there is some evidence in the record that supports the ALJ's rejection of the physical restriction that Dr. Dambrogio placed on Plaintiff, the ALJ did not indicate or discuss such evidence in his decision. (R. at 15-17). Therefore, the ALJ erred in rejecting the medical judgment of a treating physician without first discussing any contradictory medical evidence. *See Plummer*, 186 F.3d at 429. Accordingly, the ALJ's determination that Plaintiff has the residual functional capacity to perform light work is not supported by substantial evidence.

### C. Plaintiff's Credibility

Plaintiff argues that the ALJ also erred by improperly evaluating and discrediting his subjective complaints of pain in reaching the conclusion that Plaintiff has the residual functional capacity to perform light work. (Docket No. 8 at 6). Specifically, Plaintiff argues that the ALJ did not give proper weight to Plaintiff's testimony that he was not putting in a flower garden and that he was merely going outside to tell his son what to do. (Docket No. 8 at 6). In addition, Plaintiff contends that the ALJ disregarded his testimony that his medications, i.e., OxyContin, Roxicodone and Soma, have negative side effects, such as lethargy and lack of concentration.

*Id.* Plaintiff maintains that since these subjective complaints are supported by medical evidence, the ALJ should have given the complaints great weight in reaching his decision. *Id.* (citing *Ferguson*, 765 F.2d at 37). The Court notes that although Plaintiff contends that his subjective complaints are supported by medical evidence, Plaintiff fails to state in his Motion what specific medical evidence supports said complaints.[20] (Docket No. 8).

Defendant contends that the ALJ complied with the controlling regulations of 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), which permit the ALJ to consider whether there are inconsistencies between the claimant's statements regarding the intensity of pain and the extent of the claimant's daily activities. (Docket No. 10 at 10-11). Specifically, Defendant argues that Dr. Dambrogio's treatment notes state that Plaintiff's medication "permits him to function" and that Plaintiff denied any decreased mobility as recently as one month before the hearing in January 2008. *Id.* at 11. Moreover, Defendant asserts that Plaintiff's own self-reported activities prior to the hearing contradict his testimony. *Id.* at 12. Defendant maintains that Plaintiff's daily activities included: mowing his grass on a riding mower; walking his children to school; caring for his dog; driving a car; preparing meals; washing dishes; sweeping the floor; helping his

---

[20]

In a Motion for Summary Judgment, the moving party is expected to provide support for any disputed fact by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c)(1). Further, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order. FED. R. CIV. P. 56(e).

children with their homework; walking; shopping for food and clothes; paying bills; going hunting; attending his children's athletic games and lifting a maximum of 20 pounds. *Id.* Consequently, Defendant argues that Plaintiff's level of activity does not support his complaint of complete incapacity and that the ALJ correctly accommodated Plaintiff's subjective complaints of pain by limiting his residual functional capacity to light work with a sit/stand option. *Id.*

Furthermore, Defendant maintains that the ALJ reasonably determined, after thoroughly considering the totality of the evidence, that Plaintiff's subjective complaints were not fully credible with respect to his limitations. (Docket No. 10 at 11). Defendant argues that the ALJ is charged with observing a witness' demeanor and that the ALJ's findings must be accorded great weight and deference. *Id.* (citing *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 2001)).[21] Defendant insists that under the substantial evidence standard of review, it is particularly inappropriate to second-guess such credibility determination. (Docket No. 10 at 12) (citing *St. George Warehouse, Inc. v. NLRB*, 420 F.3d 294, 298 (3d Cir. 2005) (explaining that under a substantial evidence standard of review, an administrative fact-finder's determinations on issues of credibility should not be reversed unless inherently incredible or patently unreasonable)).

Where a medical impairment that could reasonably cause the alleged symptoms exists, however, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362

---

[21]

The Court notes that *Atlantic Limousine* relates to an ALJ's reliance on the demeanor of the discriminatees during their testimony in an unfair labor practices violation action. *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 2001). However, the Court of Appeals has adopted this holding in Social Security cases, as well. *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003).

(3d Cir. 1999). An ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when his or her testimony is supported by competent evidence. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)). This requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. § 404.1529(c). If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. *See Cotter*, 642 F.2d at 705. Ordinarily courts defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor. *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). The Court of Appeals has stated that: "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d 433.

With respect to Plaintiff's subjective complaints of pain, the ALJ stated as follows:

> The claimant testified that he has suffered from chronic back pain since he slipped and fell while working in March 2004. He testified that he has a herniated disc in his lumbar spine and has pain radiating into his legs, and diminished range of motion in his neck region. He testified that his legs become numb when he walks, and his ability to lift, sweep, and sit are all impaired due to his pain complaints. He testified that he has undergone laser treatments, but his relief was only short-lived. He testified that he uses medications such as OxyContin for pain, which tends to take the edge off. When I questioned the claimant regarding references in the record to his medications providing considerable relief such as a statement from a physician for May 26, 2006, the claimant

denied that his medications provide such relief. When I questioned him with respect to various references in the record about his activities, he tended to minimize these activities after stating that he injured himself on each occasion. He also believed that his treating physicians and nurses must have misunderstood him. As for his other impairments, claimant stated that he has stomach problems with frequent nausea and vomiting, and has lost about 20 pounds. As for any mental impairment, the claimant testified that he has anxiety and depression and currently receives treatment at the People in Need organization. He testified that he tends to become "short" with his children, has problems with easy anger, and has difficulty with energy levels, concentration, and memory. He testified that the medication Lexapro makes him tired. As for his activities, the claimant stated that he is able to visit with a friend, feed his children's cereal, perform some household chores, drive, and wash clothes. He testified that he uses a prescribed cane for walking.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. There is no question that the claimant does have a lumbar impairment capable of producing pain, as the result of diagnostic studies, including two MRI scans, have been consistent with rather advanced degenerative disc disease of the lumbar spine and a disc herniation (Exhibits 2F, 20F and 21F). While the claimant may have some radiculopathy, the results of electrodiagnostic studies conducted as far back as May 2004 showed no signs of radiculopathy or neuropathy (Exhibit 3F). Although the claimant has alleged that he uses a prescribed cane for ambulation, I can find no reference in the record for such an assistive device. Furthermore, examinations by Dr. Dambrogio, a treating pain management specialist, and Dr. El-Kadi, a neurologist, do not establish significant neurological compromise, especially leg weakness (Exhibits 4F, 12F, and 21F).

(R. at 14-15).

With respect to Plaintiff's credibility, the ALJ described his finding as follows:

I observed the claimant at his hearing and noted that he showed no signs of pain or mental confusion. I was not really impressed by the claimant's overall demeanor. As noted, the claimant has tended to deny or minimize the information provided by Dr. Dambrogio regarding his regular activities reported in Exhibits 12F

and 21F, but I find no reason to doubt the physician's statements in the record. Although the claimant takes medications for his various medical conditions, they appear to be rather efficacious which is consistent with Dr. Dambrogio's reports, and I find no indication that the claimant experiences any significant side effects which would further impair his concentration or otherwise affect his ability to concentrate.

(R. at 16).

The ALJ's decision includes a ten page analysis of the medical and testimonial evidence. The ALJ determined that Plaintiff's subjective complaints of pain were not credible based on a number of factors including Dr. Dambrogio's treatment notes, Plaintiff's testimony at the hearing on January 8, 2008, as well as Plaintiff's demeanor at same. (R. at 14-16). Dr. Dambrogio's treatment notes state that Plaintiff denied any arthritis, acute pain, altered mobility, reduced mobility and any neck, shoulder, arm, wrist, hip, knee or ankle problems. (R. at 364). In addition, said notes indicate that Plaintiff denied any anxiety, depression, mood swings and any alcohol or drug addiction. *Id.* Plaintiff later denied these statements at the hearing. (R. at 32-36). Moreover, the ALJ points to Dr. Dambrogio's various reports that consistently establish that Plaintiff is able to care for his dog, work in his yard and participate in activities with his son. (R. at 12). The ALJ could not find any reason to doubt the statements included in Dr. Dambrogio's treatment notes. (R. at 16).

Similarly, the ALJ referenced the additional inconsistencies that exist regarding Plaintiff's medications. (R. at 14). Despite Plaintiff's statements to the contrary, Dr. Dambrogio's notes dated May 26, 2006 state that Plaintiff's prescribed medications, Oxycodone, Roxicodone and Soma, were "working fine." (R. at 298). Therefore, the ALJ reasonably discredited Plaintiff's statements given the inconsistencies and found no indication that Plaintiff experienced any significant side effects which would affect his ability to concentrate. Thus, this

Court finds no error in the ALJ's logical explanation of his finding that Plaintiff lacks credibility based on his inconsistent statements and demeanor at the hearing.  *See Reefer,* 326 F.3d at 376; *see also Schaudeck*, 181 F.3d 433.

### D.  Evaluation of Dr. Cohen's Opinion

Finally, Plaintiff argues that the ALJ improperly determined that there are jobs in the national economy that Plaintiff can perform and that such a finding is contradictory to the testimony of the VE, Dr. Charles M. Cohen.  (Docket No. 8 at 7-8).  Specifically, Plaintiff contends that despite the testimony of the VE that there would be no jobs that Plaintiff could perform in the national economy; the ALJ determined that Plaintiff could perform jobs such as a packaging worker, an assembler, and an inspector.  *Id.* at 8.

The ALJ asked the VE whether work existed for a hypothetical individual with the same age, educational background, and vocational history as Plaintiff as depicted in the record, who is capable of performing light work which would be restricted to no more than incidental postural adaptions of stooping, kneeling, crouching, crawling, balancing and climbing; with no exposure to hazards such as unprotected heights and dangerous machinery or temperature extremes; with a job that would allow the claimant to sit/stand at his discretion; and would be restricted to simple, routine, repetitive tasks involving no piece-work production rate pace.  (R. at 48-49).  In response, the VE testified that given all of these factors the individual would be able to perform the requirements of occupations such as a packaging worker (about 700,000 jobs in the national economy), an assembler (about 1.9 million jobs in the national economy), and an inspector (about 300,000 jobs in the national economy.  (R. at 49).  Next, the ALJ asked the VE the following:

> Q:  Let me ask you to then further assume in addition to the foregoing array of limitations that the hypothetical individual

requires accommodation for unscheduled rest breaks as a result of waxing and waning symptoms. Which breaks would average 15 minutes per hour throughout the course of an eight hour workday with no specific pattern but would continue in an ongoing fashion throughout the course of employment. What extent might then impact either aforementioned or any other identifiable occupational base?

A: There would be no jobs that such a claimant could perform.

(R. at 49-50). After consideration of the entire record, the ALJ determined that Plaintiff has the residual functional capacity to perform light work with various postural limitations and allowance for a sit/stand option that would tend to accommodate the claimant's functional restrictions and his pain complaints and that there are jobs in the national economy that Plaintiff can perform. (R. at 14-16).

Defendant argues that the ALJ was not obligated to rely upon the VE's response to a hypothetical question which consisted of an accommodation for unscheduled rest breaks at an average of fifteen minutes per hour throughout the workday. (Docket No. 10 at 14). Defendant asserts that such a hypothetical question is not supported by the record. (Docket No. 10 at 14). Defendant contends that the ALJ complied with the regulations concerning the determination of residual functional capacity by considering limitations based on the relevant evidence in the record. (Docket No. 10 at 15) (citing 20 C.F.R. §§ 404.1545, 416.945).

The ALJ is not obligated to rely upon the VE's response when the limitations involved in a hypothetical are not supported by the record. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 206 (3d Cir. 2008) ("[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant. Rather, the hypotheticals posed must accurately portray the claimant's impairments and the expert must be given an opportunity to evaluate those

impairments as contained in the record."); *Dismuke v. Commissioner of Soc. Sec.*, 309 F.App'x. 613, 618 (3d Cir. 2009).

In reaching his decision, the ALJ relied on the VE's response to the initial hypothetical question posed to the VE in which he was asked whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience and residual functional capacity. (R. at 49). The VE answered in the affirmative and the ALJ found that Plaintiff has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. at 17). The ALJ was not obligated to rely on the VE's additional statement that there would be no jobs that the hypothetical individual could perform if he also required an accommodation for unscheduled rest breaks at an average of 15 minutes per hour throughout the course of an eight hour workday with no specific pattern. *Johnson*, 529 F.3d at 206. Indeed, there is no evidence in the record that supports the need for such an additional accommodation. *Id.*

However, in constructing a hypothetical question the ALJ must lay out all of the plaintiff's impairments supported by the record. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). "In order for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include *all* of the claimant's functional limitations, both physical and mental supported by the record." *Hernandez v. Barhart*, 2007 WL 2710388, at *11, Civ. Act. No. 05-9586 (S.D.N.Y., Sept. 18, 2007) (quoting *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995)). "The most appropriate way to insure the validity of the hypothetical question posed to the vocational expert is to base it upon evidence appearing in the record, whether it is disputed or not." *Gallant*, 753 F.2d at 1456.

As discussed above, there is evidence in the record that Plaintiff was restricted from lifting anything over 10 pounds as well as any repetitive bending, lifting or stooping. (R. at 289). Therefore, the lifting limitation should have been included as part of the ALJ's question to the VE. *Id.* In fact, when cross-examined, the VE stated that if the individual would be unable to life 10 pounds on a frequent basis, he would be unable to perform available jobs at the light level. (R. at 50). Because Plaintiff's lifting limitation is supported by medical evidence, the ALJ had no clear and convincing reason for rejecting it. *Gallant*, 753 F.2d at 1456. Indeed, the ALJ makes no attempt to provide a reason to reject Plaintiff's lifting limitation in his decision. Accordingly, the Court cannot conclude that the ALJ's determination that Plaintiff can perform other work which exists in the national economy meets the substantial evidence standard. *Id.*

## VI. CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Summary Judgment (Docket No. [7]) is GRANTED, Defendant's Motion for Summary Judgment (Docket No. [9]) is DENIED, and the ALJ's decision is REMANDED for further consideration. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: February 9, 2011
cc/ecf: All counsel of record.